## IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
## IN AND FOR PALM BEACH COUNTY, FLORIDA

| | |
|---|---|
| VILLAGE OF WELLINGTON AND ITS DEPENDENT SPECIAL DISTRICT, ACME IMPROVEMENT DISTRICT, | Case No.: |
| Plaintiffs, | |
| v. | COMPLAINT WITH JURY DEMAND |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ANGUS INTERNATIONAL SAFETY GROUP, LTD; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CENTRAL SPRINKLER, LLC; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; FIRE PRODUCTS GP HOLDING, LLC; JOHNSON CONTROLS INTERNATIONAL, PLC; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., | |
| Defendants. | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, Village of Wellington and its dependent special district, Acme Improvement District ("Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals

1

Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Angus International Safety Group, Ltd., Archroma Management, LLC, Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Central Sprinkler, LLC, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Fire Products GP Holding, LLC, Johnson Controls International, plc, Kidde PLC, Inc., Nation Ford Chemical Company, National Foam, Inc., Raytheon Technologies Corporation (f/k/a United Technologies Corporation), The Chemours Company, The Chemours Company FC, LLC, Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), UTC Fire & Security Americas Corporation, Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and allege as follows:

## SUMMARY OF THE CASE

1.      In a specific effort to comply with the pending Preliminary Settlement Approval Orders related to 3M Company and E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc., Plaintiffs bring this action against Defendants 3M Company, E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively, the "Six Defendants") to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the contamination of their wastewater, wastewater treatment system, and wastewater infrastructure and facilities caused and/or created by the Six Defendants' products, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of the Six Defendants.

2.      Plaintiffs bring this action against all remaining Defendants to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the ongoing contamination of their Property, as defined below, caused and/or created by Defendants' products, diminished property value, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

3.      The Village of Wellington ("Village") was established as an independent municipality on December 31, 1995 in accordance with Chapter 1995-496, Laws of Florida. The Village was created over the Acme Improvement District ("Acme').

4.      The Village of Wellington is a Florida municipality and is a separate government from the State of Florida and Palm Beach County.

5.      Acme is a dependent special district of the Village, organized under the laws of the State of Florida pursuant to Section 163.01 of the Florida Statutes.

6.      Acme was originally created by the Florida Legislature in 1953  by Chapter 1953-28557, Laws of Florida, to provide drainage, water management, and infrastructure development in western Palm Beach County.

7.      After the Village was incorporated in 1995, Acme was converted from an independent special district to a dependent special district of the Village.

8.      Acme owns, operates, and maintains water production, transmission, treatment and distribution facilities, water reclamation collection, transmission, treatment and systems, and wastewater collection and transmission facilities and the Village manages Acme.

9.      Plaintiffs have a property interest in the water Acme appropriates, treats, reclaims, stores and distributes, water sources, water supplies, wells, piping, distribution system, water treatment systems, wastewater it collects, treats and disposes of, its wastewater collection and

transmission systems, its reclamation collection, transmission, and treatment systems, and all other lands, properties, facilities, and infrastructure owned and/or operated by Plaintiffs (collectively, "Plaintiffs' Property").

10.     Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), have been detected in portions of Plaintiffs' Property, including Plaintiffs' drinking water supplies, drinking water system, and reclaimed water.

11.     PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

12.     At various times from the 1960s through today, Defendants designed, manufactured, formulated, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or products containing PFOS, PFOA, and/or their chemical precursors (collectively, "Fluorosurfactant Products"), and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products.

13.     Defendants' Fluorosurfactant Products include, but are not limited to, Teflon, Scotchguard, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, aqueous film-forming foam ("AFFF"), and various other products.

14.     AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

15.     Defendants designed, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment even when used as directed and intended by the Defendants.

16.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at or near Plaintiffs' Property, including Plaintiffs' water sources.

17.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFOS, PFOA, and/or their chemical precursors have been detected in Plaintiffs' Property.

18.     Plaintiffs' Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

19.     At all times pertinent herein, Plaintiffs did not know, nor should Plaintiffs have known, of the ongoing contamination of their Property through the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

20.     Through this action, Plaintiffs seek to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, dispose of, treat, and monitor the PFOS and PFOA contamination of Plaintiffs' Property caused by the use, storage, and/or disposal of Defendants' Fluorosurfactant Products, as well as any and all other damages recoverable under state and/or applicable federal laws.  Plaintiffs also seek damages and restitution for the diminution of value of Plaintiffs' Property, as well as reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action because this is an action for damages in excess of fifty thousand dollars ($50,000.00).

22.     Venue is appropriate pursuant to Fla. Stat. § 47.011 because a substantial part of the events and omissions giving rise to Plaintiffs' causes of action accrued in Palm Beach County, and because the property and resources affected by Defendants' conduct are located in Palm Beach County.

## PARTIES

23.     Plaintiff Village of Wellington is an independent municipality and body politic located at 12300 Forest Hill Blvd., Wellington, FL 33414.

24.     Plaintiff Acme Improvement District is a dependent special district of the Village of Wellington and is located at 12300 Forest Hill Blvd., Wellington, FL 33414.

25.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of the Fluorosurfactant Products that have and continue to contaminate Plaintiffs' Property:

    a.  Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Florida, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including in Florida.

    b.  Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  DuPont is registered to do business in Florida.

    c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours is registered to do business in the State of Florida.

    d.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of

litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Florida.

f.  Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.  Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). New DuPont is registered to do business in Florida.

g.  Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Florida.

h.  Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Florida.

7

Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of Florida.

i.   Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.  Tyco acquired Chemguard in 2011.  Tyco is registered to do business in Florida.

j.   Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul").  Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in Florida.

k.   Defendant Johnson Controls International, plc is an Irish public limited company with its principal place of business located at One Albert Quay, Cork, Ireland. Upon information and belief, Johnson Controls International, plc is the parent company of Tyco.

l.   Defendant Central Sprinkler, LLC is a Delaware limited liability company with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania19446. Upon information and belief, this Defendant is a limited partner of Tyco. Upon information and belief, Chemguard is wholly-owned by Central Sprinkler, LLC. Upon information and belief, Central Sprinkler, LLC has conducted and/or availed itself of doing business throughout the United States, including in Florida.

8

m. Defendant Fire Products GP Holding, LLC is a Delaware limited liability company with its principal place of business located at 5757 N Green Bay Ave., Milwaukee, Wisconsin 53209. Upon information and belief, this Defendant is a general partner of Tyco. Fire Products GP Holding, LLC is registered to do business in Florida.

n. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

o. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

p. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in Florida.

q. Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in Florida.

r.  Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, Massachusetts 02451. Raytheon Tech f/k/a United Tech is registered to do business in Florida.

s.  Defendant National Foam, Inc. is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. Upon information and belief, National Foam, Inc. is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam, Inc. manufactures the Angus brand of AFFF products. Upon information or belief, National Foam, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

t.  Defendant Angus International Safety Group, Ltd. is a foreign private limited company, United Kingdom registration number 8441763, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom. Upon information and belief, Angus International Safety Group, Ltd. is the parent company of National Foam, Inc.

u.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.  Upon information or belief, Buckeye has conducted and/or availed itself of doing business throughout the United States, including in Florida.

v.  Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is registered to do business in Florida.

w.  Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.  Upon information and belief, BASF Corporation acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.  BASF Corporation is registered to do business in Florida. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals conducted and/or availed itself of doing business throughout the United States, including in Florida.

x.  Defendant ChemDesign Products, Inc. is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.  Upon information and belief, ChemDesign Products, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

y.  Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Florida.

z.  Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.  Upon information and belief, Chemicals Incorporated has conducted and/or availed itself of doing business throughout the United States, including in Florida.

aa. Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company has conducted and/or availed itself of doing business throughout the United States, including in Florida.

bb. Defendant AGC Chemicals Americas, Inc. ("AGCCA") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.  Upon information and belief, AGCCA is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. Upon information and belief, AGCCA has conducted and/or availed itself of doing business throughout the United States, including in Florida.

cc. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

dd. Defendant Deepwater Chemicals, Inc. is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater Chemicals, Inc. has conducted and/or availed itself of doing business throughout the United States, including Florida.

ee. Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, Dynax Corporation has conducted and/or availed itself of doing business throughout the United States, including in Florida.

ff. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

gg. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217.

Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC. Upon information and belief, Archroma U.S., Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

hh. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiffs' Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

26.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

27.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## FACTUAL ALLEGATIONS

### A.  THE CONTAMINANTS: PFAS

28.     PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA").  PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").  PFAA is composed of a chain of carbon atoms in which all but one of the

carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent.  PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

29.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water.  Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

30.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

31.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

32.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

33.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g.,

_____

[1] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[2] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.
[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

34.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

35.     EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[6]

36.     In 2016, EPA issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

37.     On June 15, 2022, EPA issued interim, updated drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt PFOS that replace those EPA issued in 2016.[7]

38.     On March 14, 2023, EPA announced proposed National Primary Drinking Water Regulations to establish legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS known to occur in drinking water: PFOA, PFOS, perfluorononanoic acid

---

[4] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[5] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[6] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[7] *See* "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA 822-F-22-002, available at https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan.

("PFNA"), hexafluoropropylene oxide dimer acid (commonly known as "GenX"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutane sulfonic acid ("PFBS").[8]

39.    EPA is proposing individual MCLs of 4.0 ppt for PFOA and PFOS, and is proposing to regulate PFNA, HFPO-DA, PFHxS, and PFBS as a mixture, through an approach called a Hazard Index.[9]

## B. DEFENDANTS' FLUOROSURFACTANT PRODUCTS

40.    PFOA, PFOS, and their chemical precursors are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the State of Florida, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF.

41.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

42.    The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOA, PFOS, and/or their chemical precursors.

43.    PFOS and/or the chemical precursors to PFOS contained in 3M's Fluorosurfactant Products were manufactured by 3M's patented process of electrochemical fluorination.

44.    Other Defendants manufactured fluorosurfactants through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

45.    When used as the Defendants intended and directed, Defendants' Fluorosurfactant Products release PFAS, including PFOA, PFOS, and/or their chemical precursors, into the environment.

---

[8] EPA, "Fact Sheet: EPA's Proposal to Limit PFAS in Drinking Water March 2023," available at https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf.
[9] *Id.*

46.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, sediment, surface water, and groundwater.

47.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their chemical precursors to enter the environment where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the soil, sediment, groundwater, and surface water, including Plaintiffs' Property, thereby causing extensive and ongoing damage to Plaintiffs and Plaintiffs' Property.

48.     Due to the chemicals' persistent nature, among other things, these chemicals have and continue to cause injury and damage to Plaintiffs and Plaintiffs' Property.

**C.  DEFENDANTS' KNOWLEDGE OF PFAS HAZARDS**

49.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

50.     Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

51.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[10]

52.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

53.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[11]

54.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[12]

55.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

56.     From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick cookware,

---

[10] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[11] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[12] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

57.      Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their Fluorosurfactant Products that were discharged into the environment and contaminated Plaintiffs' Property.

58.      DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[13]

59.      By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[14] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[15]

60.      By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[16] between PFOA exposure and the

---

[13] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

[14] $16.5 million.

[15] U.S.Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).

[16] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[17]
By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA
and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and
ulcerative colitis.

61.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new
publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its
perfluorinated chemical liabilities into the lap of the new Chemours.

62.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1)
designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued
instructions on how Fluorosurfactant Products should be used and disposed of (namely, by
washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or
PFOS to contaminate the surface water, soil, and groundwater in and around the Plaintiffs'
Property; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently
designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface
water, soil, and groundwater contamination as a result of standard use and disposal of these
products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the
users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of
the purchasers of the Fluorosurfactant Products.

63.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint,
Plaintiffs' Property has been and will continue to be contaminated with PFAS, including PFOA
and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct
and proximate result of Defendants' actions and/or inactions, Plaintiffs must assess, evaluate,

---

[17] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011),
http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

investigate, monitor, remove, clean up, correct, treat, and remediate PFAS contamination on their Property at significant expense, loss and damage.

64.     Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

**D.   OLD DUPONT AND RELATED ENTITIES' PLANS TO SHIELD ASSETS FROM PFAS LIABILITIES**

65.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

66.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

67.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

68.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

69.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont

employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

70.      In or around July 1, 2015, Old DuPont completed the spin-off of Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

71.      Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

72.      Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

73.      Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

74.      Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

75.      Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

76.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

77.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

78.     By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

79.     Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

80.     Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

**E.  THE IMPACT OF PFAS ON PLAINTIFFS' PROPERTY**

81.     PFAS have been detected in portions of Plaintiffs' Property. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, in Plaintiffs' Property in varying amounts and at varying times has resulted, and will continue to result, in significant injuries and damage to Plaintiffs.

82.     Upon information and belief, the invasion of Plaintiffs' Property with PFAS is recurring, resulting in new harm to Plaintiffs on each occasion.

83.     The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiffs and Plaintiffs' Property. Plaintiffs' interests in protecting their Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

**FIRST CAUSE OF ACTION**

STRICT LIABILITY – DEFECTIVE DESIGN

84.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

85.     The Fluorosurfactant Products which were designed, manufactured, marketed, sold and/or distributed by Defendants were defectively designed when they entered the stream of commerce and were received by Plaintiffs.

86.     Defendants' Fluorosurfactant Products did not include sufficient instructions or sufficient warnings of potential safety or environmental hazards, such as the pollution of soil, surface water, and groundwater.

87.     Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

88.     Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

89.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiffs, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

90.     Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiffs' Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

91.     It was reasonably foreseeable that Defendants' Fluorosurfactant Products would be used on and/or in the vicinity of Plaintiffs' Property.

92.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFAS into the surface water, soil, and groundwater.

93.     Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

94.     Plaintiffs were, are and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

95.     Defendants' Fluorosurfactant Products' failure to perform safely was a substantial factor in causing Plaintiffs' harm.

96.     The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFAS contamination is widespread, persistent and toxic.

97.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

98.     At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

99.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, diminution of property value, and all other equitable and applicable damages.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

100.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

101.     As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiffs, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

102.     Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

103.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiffs, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

104.     Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiffs' Property.

105.     Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

106.     Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiffs' Property were defective in design and unreasonably dangerous for the reasons set forth above.

107.     Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products on or near Plaintiffs' Property, including contamination of Plaintiffs' Property with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

108.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

109.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, diminution of property value, and all other equitable and applicable damages.

## THIRD CAUSE OF ACTION

### PUBLIC NUISANCE

110.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

111.     Defendants designed, manufactured, distributed, marketed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products in a manner that created, or participated in creating, a public nuisance that unreasonably and substantially interferes with the use and enjoyment of Plaintiffs' Property, and unreasonably endangers or injures the

health, safety, and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

112.    The unreasonable and substantial interference with the use and enjoyment of Plaintiffs' Property includes, but is not limited to: the contamination of Plaintiffs' Property, including Plaintiffs' water supply source, with PFAS; and the exposure to known toxic chemicals manufactured and/or sold by Defendants.

113.    The presence of PFAS causes significant costs, inconvenience, and annoyance to Plaintiffs. The contamination affects a substantial number of people who rely upon Plaintiffs for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe natural resources and environment.

114.    The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing Fluorosurfactant Products and concealing the dangers those Products posed to human health and the environment.

115.    Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiffs in the form of present and serious interference with the use, benefit, and/or enjoyment of their Property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

116.    As a result of the actual and threatened PFAS contamination caused by Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public, and Plaintiffs have incurred, and will continue to incur, substantial costs to remove the contamination from their Property.

117.    Plaintiffs did not consent to the conduct that resulted in the contamination of their Property.

118.    Defendants' conduct was a substantial factor in causing the harm to Plaintiffs.

119.     Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiffs' Property by Plaintiffs.

120.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees,  diminution of property value, and all other equitable and applicable damages.

**FOURTH CAUSE OF ACTION**

PRIVATE NUISANCE

121.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

122.     Plaintiffs' Property has been, and continues to be, contaminated by PFAS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

123.     Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiffs in the form of present and serious interference with the ordinary safety, use, benefit, and/or enjoyment of Plaintiffs' Property.

124.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, diminution of property value, and all other equitable and applicable damages.

**FIFTH CAUSE OF ACTION**

NEGLIGENCE

125.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

126.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Plaintiffs, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

127.     Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiffs' Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

128.     A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

129.     Plaintiffs were, are, and will continue to be harmed by Defendants' conduct.

130.     Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed, and sold without adequate warning of toxicity, potential human health risks and environmental hazards.

131.     Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

132.     Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

133.     Defendants knew or reasonably should have known that users and third parties would not realize the dangers.

134.     Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000.

135.     Defendants failed to recall their Fluorosurfactant Products.

136.     A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant Products.

137.     Defendants' failure to warn or instruct was a substantial factor in causing Plaintiffs' harm.

138.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

139.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring,

treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, diminution of property value, and all other equitable and applicable damages.

<b>SIXTH CAUSE OF ACTION</b>

NEGLIGENCE <i>PER SE</i>

140.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-64 and 81-83.

141.     Plaintiffs allege that Defendants so negligently, carelessly and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled and/or sold Fluorosurfactant Products and/or negligently, carelessly and recklessly recommended application and disposal techniques for its Fluorosurfactant Products that they directly and proximately caused contamination of Plaintiffs' Property in violation of Florida Statute § 403.161(1) (public health), which sets a standard of care or conduct to protect Plaintiffs and all persons or property within its jurisdiction, as well as the environment, from the type of improper activities engaged in by Defendants.

142.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, diminution of property value, and all other equitable and applicable damages.

<b>SEVENTH CAUSE OF ACTION</b>

FRAUDULENT TRANSFER (UFTA DEFENDANTS)

143.     Plaintiffs reallege and reaffirm all allegations set forth in paragraphs 1-84.

144.     Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UFTA") as adopted by the State of Florida in Florida Statutes § 726.101-112, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UFTA Defendants").

145.     Pursuant to Florida Statutes § 726.101-112, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    a.  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

    b.  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        i.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        ii. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

146.     Further, the statute states, in part, that "[i]n determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether: […] before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; the transfer was of substantially all the debtor's assets; […] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

147.     Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly-owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

148.     Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

149.     Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

150.     The UFTA Defendants acted with actual intent to hinder, delay and to defraud any creditor of the UFTA Defendants because: (1) they were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

151.     The UFTA Defendants engaged in actions in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of Plaintiffs, and other similar parties, that have been damaged as a result of UFTA Defendants' conduct, omissions, and actions described herein.

152.     As a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

153.     Pursuant to Florida Statute § 726.101-112, Plaintiffs seek avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiffs in this action.

154.     Plaintiffs further seek all other rights and remedies that may be available to it under UFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries Plaintiffs have suffered as alleged in this Complaint.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against 3M, E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. for the contamination of their wastewater, wastewater treatment system, and wastewater infrastructure and facilities.

WHEREFORE, Plaintiffs pray for judgment against all other Defendants named herein for the contamination of their water sources, water supplies, wells, water treatment system, water infrastructure and facilities, wastewater, wastewater treatment system, and wastewater infrastructure and facilities.

WHEREFORE, Plaintiffs respectfully request a trial of this Action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

1. Compensatory damages according to proof including, but not limited to:

   a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiffs' Property;

    b.   costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiffs' Property;

    c.   costs and expenses associated with and related to the removal and disposal of the contamination; and

    d.   costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiffs' Property.

2.   Diminished property value;

3.   Consequential damages;

4.   Costs, disbursements, and attorneys' fees of this lawsuit;

5.   Pre-judgment and post-judgment interest; and

6.   Any other and further relief as the Court deems just, proper, and equitable.

DATED: October 10, 2023                Respectfully submitted,

/s/ Louise R. Caro
Louise R. Caro (FL Bar 633380)
**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
lcaro@cossichlaw.com

**MANSON BOLVES DONALDSON TANNER, P.A.**
109 North Brush Street, Suite 300
Tampa, Florida 33602
Telephone: (813) 514-4700
Fax: (813) 514-4701
Laura Donaldson (FL Bar 139696)
ldonaldson@mansonbolves.com
*Attorneys for Plaintiffs*

NOT A CERTIFIED COPY